1    Erin Rose Ronstadt, SBN 028362
     Kevin Koelbel, SBN 016599
2    OBER & PEKAS, PLLC
     3030 N. 3rd Street, Suite 1230
3    Phoenix AZ 85012
     Phone: (602) 277-1745
4    Fax: (602) 761-4443
     erin@oberpekas.com
5    kevin@oberpekas.com

6    Attorneys for Plaintiff

7              **IN THE UNITED STATES DISTRICT COURT**

8              **FOR THE DISTRICT OF ARIZONA**

9    Lynn M. Pachunka, a married woman,        | **Case No.**

10                              Plaintiff,

11   v.                                        | **COMPLAINT**

12   Hartford Life and Accident Insurance      | (Jury Trial Demanded)
     Company, a foreign insurer,

13                              Defendant.

14

15          For her claims against Defendant Hartford Life and Accident Insurance Company

16   ("Hartford" or "Defendant"), Plaintiff Lynn M. Pachunka ("Ms. Pachunka") alleges as

17   follows:

18                **PARTIES, VENUE, AND JURISDICTION**

19          1.      Ms. Pachunka is a married person. She currently resides in Maricopa County,

20   Arizona and has been a resident of Maricopa County at all relevant times.

21          2.      Hartford Life and Accident Insurance Company is wholly-owned by Hartford

22   Life, Inc., which is wholly-owned by Hartford Holdings, Inc., which is wholly-owned by

23   The Hartford Financial Services Group, Inc.

24          3.      In addition, Hartford – Comprehensive Employee Benefit Service Company

25   (CT Corporation) is wholly-owned by Hartford Financial Services, LLC (Delaware Limited

26   Liability Company), which is wholly-owned by Hartford Life and Accident Insurance

27   Company.

28          4.      The Hartford Financial Services Group, Inc. (known as "The Hartford";

NYSE: HIG) is an insurance and financial services company with total 2013 revenues of $26.2 billion and total assets of $298.5 billion.  Total revenues for the Group Benefits organization in 2013 were $3.8 billion.

5.     Hartford was ranked 112th on the 2013 Fortune 500 list.  The Hartford, headquartered in Connecticut, is among the largest providers of investment products, Individual Life, Group Life and Group Disability insurance products, and Property and Casualty insurance products in the United States.

6.     The Hartford's Group Benefits organization ranks number five in combined fully insured Group Disability and Life sales premiums among United States group carriers (LIMRA data 4Q 2013).  The relatively large size and underwriting capacity of the Company's business provides it with market opportunities not available to smaller competitors.

7.     The Hartford provides a portfolio of group insurance products to employers, association and affinity groups including short-term disability ("STD"), long-term disability ("LTD"), Life, and Accidental Death & Dismemberment ("AD&D") insurance as well as Leave Management services.

8.     Hartford is an insurance company licensed and authorized to do business in Arizona.

9.     Hartford has intentionally availed itself of the benefits and protections of Arizona.

10.     Hartford operates insurance sales offices in Arizona, including but not limited to the sale of LTD policies.

11.     The State of Arizona purchased Policy Number GL-395211 (the "Life Policy") from Hartford to provide life insurance benefits to certain employees of the State of Arizona, including Ms. Pachunka.

12.     The State of Arizona purchased Policy Number GLT-395211 (the "LTD Policy") from Hartford to provide LTD disability insurance benefits to certain employees of the State of Arizona, including Ms. Pachunka.

**OBER & PEKAS, PLLC**
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

**OBER & PEKAS, PLLC**
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

13.     In exchange for premiums, Hartford fully insures Life and LTD benefits and administers claims.

14.     The benefits are provided as "government plans" exempt from the Employee Retirement Income Security Act of 1974 ("ERISA") and subject to Arizona law.

15.     Ms. Pachunka was injured as a result of Hartford's breach of contract and bad faith refusal to provide disability benefits under the Life Policy and LTD Policy.

16.     Jurisdiction is proper in the United States District Court for the District of Arizona pursuant to 28 U.S.C. § 1332.

17.     Venue is proper in Arizona under 28 U.S.C. § 1391(b)(2).

18.     Ms. Pachunka demands a jury trial on all triable issues.

## GENERAL ALLEGATIONS

*The Policy Benefits*

19.     Under the Life Policy, Ms. Pachunka is entitled to a waiver of premiums for life insurance benefits if she meets the definition of "Disabled" in the LTD Policy.

20.     The LTD Policy defines "Disability or Disabled" as:

You are prevented from performing *one or more* of the Essential Duties of:
Your Occupation during the Elimination Period;
Your Occupation, for the 24 month(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
after that, Any Occupation

(emphasis added).

21.     The LTD Policy defines the "Elimination Period" as "the longer of the number of consecutive days at the beginning of any one period of Disability which must elapse before benefits are payable or the expiration of any accumulated sick pay program."

22.     The minimum number of days in the Elimination Period is 180.

23.     The LTD Policy defines an "Essential Duty" as

a duty that:
is substantial; not incidental
is fundamental or inherent to the occupation; and
cannot be reasonably omitted or changed.
Your ability to work the number of hours in Your regularly scheduled work week is an Essential Duty.

-3-

24.     The LTD Policy defines "Your Occupation" as "Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location."

25.     The LTD Policy defines "Any Occupation" as:

any occupation for which [the insured is] qualified by education, training, or experience, and that has an earnings potential greater than the lesser of:
the product of Your Indexed Pre-disability Earnings and the Benefit Percentage; or
the Maximum Monthly Benefit.

26.     Under the LTD Policy's definition of Disability, a claimant is disabled from "Any Occupation" if she is prevented from performing *one or more* of the Essential Duties of any occupation.

27.     Under the LTD Policy, a covered employee who meets the definition of Disabled is entitled to receive LTD benefits until age 65 or until no longer Disabled.

28.     The monthly Disability benefit under the LTD Policy is calculated as 66 2/3% of Monthly Income Loss before the deduction of Other Income Benefits.

29.     Other Income Benefits include "85% of the disability benefits under the United States Social Security Act."

30.     Although Ms. Pachunka does not concede Hartford's right to an offset for Social Security benefits, the sum of Ms. Pachunka's benefit payments until age 65 after offsets for Other Income Benefits is approximately $200,000.

*Ms. Pachunka's Employment*

31.     The State of Arizona employed Ms. Pachunka as a Corrections Officer at the Perryville prison for approximately eleven years.

32.     Ms. Pachunka worked for the State of Arizona as a Corrections Officer until her last date of work on July 20, 2013.

33.     As a Corrections Officer, Ms. Pachunka was tasked with the following responsibilities and duties:

➢ Maintaining order and security

➢ Supervising the activities of the inmates

**OBER & PEKAS, PLLC**
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

➢ Inspecting the inmates, their cells, and shared facilities for contraband and other signs of misconduct

➢ Restraining inmates in handcuffs and leg irons

➢ Escorting inmates to/from their cells to various facilities

➢ Responding to disturbances, riots, assaults, and escapes and using reasonable force as necessary.

34. Because security had to be provided around the clock 24 hours a day, Ms. Pachunka worked long hours throughout the night.

35. Because of the nature of her occupation, Ms. Pachunka would often encounter dangerous and unpredictable situations.

36. 'Corrections Officer' is a heavy-duty occupation. Ms. Pachunka was required to stand and walk for long periods of time. She had to be able to physically respond to emergencies and incidents at a moment's notice and had to be able to walk, run, climb, carry, push, and lift heavy objects. She had to have the physical strength to subdue other inmates and break up riots.

37. Hartford noted that her job required: "standing, walking, restraining, lifting up to adult person weight."

38. Ms. Pachunka's last date of work was on July 20, 2013.

*Ms. Pachunka's Medical Conditions*

39. Ms. Pachunka suffers from pain and fatigue secondary to Fibromyalgia.

40. She meets the American College of Rheumatology's criteria for Fibromyalgia.

41. She has moderate to severe pain in her upper back, shoulders, elbows, lower back, and buttocks, which is exacerbated with standing, walking, movement, or lifting.

42. Ms. Pachunka's treating providers have prescribed multiple medications for her pain, and she also receives trigger point injections for her pain.

43. Ms. Pachunka also has chronic anemia related to malabsorption issues secondary to her history of gastric bypass procedure.

44. The anemia causes weakness and fatigue.

-5-

45.     She has undergone red blood cell transfusions, intravenous ferumoxytol treatments, and B12 injections to combat her anemia.

46.     Despite treatment for anemia, she has chronically low hemoglobin counts.

47.     Ms. Pachunka's treating physicians have determined that she cannot work due to her physical conditions.

48.     The Social Security Administration ("SSA") has determined that she cannot work due to her physical conditions.

49.     Ms. Pachunka also suffers from depression secondary to her physical conditions.

50.     Ms. Pachunka cannot perform the essential duties of her "Own Occupation" or "Any Occupation" as defined in the LTD Policy.

*Hartford's Claim Handling*

51.     Ms. Pachunka applied STD benefits.

52.     Ms. Pachunka filed for STD based on her physical complaints of "pain [and] fatigue" secondary to Fibromyalgia.

53.     Hartford initially approved her STD benefits for Ms. Pachunka's reported symptoms of "pain [and] fatigue" secondary to Fibromyalgia.

54.     However, Hartford terminated STD benefits on October 8, 2013.

55.     Ms. Pachunka retained legal counsel in early 2014.

56.     On May 17, 2014, Ms. Pachunka appealed Hartford's decision to terminate her STD benefits and submitted support for her LTD benefits claim under the "Own Occupation" definition in the LTD Policy.

57.     As Hartford's claims manager would aptly state on August 26, 2014, Ms. Pachunka's claim was "unfortunately . . . one mistake on top of another."

58.     On June 12, 2014, Hartford instructed that it was treating Ms. Pachunka's STD appeal as a "proof of loss" submission; it planned to send the appeal back to the same nurse case manager responsible for denying the claim and consider whether the evidence changed Hartford's assessment. Ms. Pachunka's legal counsel explained this was unfair in

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

-6-

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

1   violation of the STD Policy and law; not only did Ms. Pachunka already appeal, but also

2   would have to restart the entire appeals process over if the nurse case manager did not find

3   the new evidence submitted on appeal changed her mind. Hartford said it would try to get

4   the appeals division to change its mind.

5         59.   Ms. Pachunka's legal counsel had to resubmit the STD appeal on June 26,

6   2014 after several phone calls and correspondence, because Hartford misclassified Ms.

7   Pachunka's claim as one for "proof of loss," thereby rejecting the appeal.

8         60.   Hartford's mismanagement and misclassification of the STD claim and appeal

9   resulted in undue delay, stress, and serious financial strain to Mr. and Mrs. Pachunka.

10         61.   In a letter dated August 8, 2014, Hartford again – and frustratingly - refused

11   to consider the STD appeal, continuing to construe it as a "proof of loss" submission.

12         62.   Ms. Pachunka was on the verge of filing a lawsuit in late August 2014. By this

13   time, as a result of Hartford's denial and delay, she and her husband had depleted their

14   savings, cashed out stock options, and transferred to Mr. Pachunka's health insurance,

15   which had higher deductibles, all to make ends meet. They were paying their bills, but only

16   just, and a large portion of Mr. Pachunka's income was going to doctors' bills and

17   medication expenses.

18         63.   On August 27, 2014, Hartford finally made a determination on Ms.

19   Pachunka's STD appeal and reinstated benefits. However, it deposited all of the money into

20   Ms. Pachunka's account directly in violation of her legal counsel's lien on the funds.

21         64.   Hartford took several months to consider and approve Ms. Pachunka's LTD

22   benefits.

23         65.   On December 11, 2014, Hartford approved Ms. Pachunka's claim for LTD

24   benefits based on her physical impairments and inability to perform her Own Occupation.

25         66.   On December 15, 2014, Harford approved Ms. Pachunka's Life Insurance

26   Waiver of Premium ("LWOP") claim.

27         67.   Under the LWOP Policy, "Disabled means You are prevented by injury or

28   sickness from doing any work for which You are, or could become, qualified by: a)

education; b) training; or 3) experience."

68.    On July 23, 2015, Hartford notified Ms. Pachunka that it had initiated a review to determine if she will qualify for benefits under the "Any Occupation" definition of Disability on and after January 17, 2016.

69.    On August 26, 2015, Hartford informed Ms. Pachunka that it needed the following documents to evaluate her claim:

> Attending Physicians Statement ("APS") signed and dated by a Physician;
> APS (for Mental Health claims);
> A copy of Ms. Pachunka's medical records covering the period of January 1, 2015 to current from Drs. Gomez, Alfonso, Zak, Ndum, and Dantini, as well as Florida Hospital Flagler; and
> A copy of Ms. Pachunka's pharmacy log from any and all pharmacies for the period January 1, 2015 to current.

70.    In its August 26, 2015 letter, Hartford rejects the APS completed by Mary Reynolds, FNP purportedly because it was not dated or completed by a "Physician."

71.    Under the LTD Policy, Mary Reynolds, FNP meets the definition of "Physician," as she is a "legally qualified practitioner of a healing art" who is "licensed to practice in the jurisdiction where care is being given" and is "practicing within the scope of that license."

72.    On September 24, 2015, Ms. Pachunka requested additional time to supply the documentation requested by Hartford in its August 26, 2015 letter. Hartford did not respond to Ms. Pachunka's request.

73.    On October 9, 2015, Ms. Pachunka made a partial disclosure of the documentation requested by Hartford in its August 26, 2015 letter.

74.    On October 26, 2015, Ms. Pachunka disclosed the remaining outstanding information requested by Hartford in its August 26, 2015 letter, including an October 22, 2015 APS form signed by Ms. Reynolds and Dr. Alfonzo.

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

75.     Ms. Reynolds and Dr. Alfonzo's October 22, 2015 APS form concluded a less than sedentary capacity.

76.     On December 16, 2015, Hartford notified Ms. Pachunka that, after further review of her claim, she continued to qualify for LWOP benefits and remained Disabled as defined by the LWOP Policy.

77.     On December 20, 2015, Nurse Case Manager Rowena N. Buckley conducted a medical file review and concluded:

> R/Ls [restrictions and limitations] seem reasonable given [Ms. Pachunka's] report of widespread and severe pain. She has difficulty concentrating because of her medications and states that because of her physical constraints, worsening pain, and side effects of med[ication], she is unable to work as a [Corrections Officer] or in any position on a consistent/full-time basis. R/Ls are reasonable and supported for part time activities.

78.     On January 15, 2016, Hartford advised Ms. Pachunka that it was currently reviewing her LTD claim and was unable to determine if she was eligible for benefits on or after January 17, 2016 at that time. In this letter, Hartford stated that,

> Benefits will continue to be provided while we continue to investigate Ms. Pachunka's claim for ongoing benefits. This will allow us time to properly evaluate the claim without creating financial hardship. Benefits are being made without admitting liability under the terms of the above policy. Should it later be determined that Ms. Pachunka is not eligible for benefits, she will not be asked to repay the above benefit. If, however, her claim is approved for benefits beyond 1/17/16, it is understood that this payment will represent any benefits due for the period indicated.

79.     In its January 15, 2016, letter, Harford also informed Ms. Pachunka that is needed additional clarification of her functionality from her mental health provider, Dr. Gomez.

80.     On February 1, 2016, Hartford's Clinical Case Manager Christie Ivancic, LMSW sent questions to Dr. Gomez regarding Ms. Pachunka's mental/psychiatric conditions and limitations.

81.     Ms. Ivancic's February 1, 2016 letter was not provided to Ms. Pachunka until February 16, 2016.

82.     Likewise, Hartford did not advise Ms. Pachunka that it was having difficulty reaching Dr. Gomez until February 16, 2016.

-9-

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

83.     In a letter dated February 17, 2016, Ms. Pachunka responded to Ms. Ivancic's February 1, 2016 letter to Dr. Gomez expressing concern with Hartford's attempts to contact Dr. Gomez via telephone and its focus on Ms. Pachunka's mental health versus her primary physical medical conditions.

84.     In Ms. Ivancic's February 1, 2016 letter, she advised Ms. Pachunka that she had called Dr. Gomez "multiple times (12/28/15, 1/5/16, 1/15/16, 1/25/16 and 2/1/16)" and advised Dr. Gomez that, "[a] verbal response can be made by calling me at the phone number below."

85.     At the time of Ms. Ivancic's telephone contact with Dr. Gomez, neither Hartford nor any third parties were authorized to directly communicate with Ms. Pachunka's treating providers by telephone. Ms. Pachunka had expressly limited Hartford's authorization to contacting Ms. Pachunka's treating providers in writing or by telephone conference arranged through her legal counsel.

86.     Hartford was advised on multiple occasions that direct telephonic contact with Ms. Pachunka's treating providers was in violation of the authorization it had on file.

87.     On February 17, 2016, Ms. Pachunka provided Hartford with Dr. Gomez's responses to its February 1, 2016 correspondence. In addition to Dr. Gomez's assessment on Ms. Pachunka's mental restrictions and limitations, he notes "significant other medical problems such as chronic pain" and "decompensation regarding physical health."

88.     On February 18, 2016, Hartford decided that Ms. Pachunka's disability was not physical and as of January 17, 2016, she was not entitled to benefits based on her physical condition, but Hartford would continue benefits based on her mental condition and apply the 24-month limitation for mental/nervous disorders terminating her benefits effective January 16, 2018:

> Based on this information, we have concluded that Ms. Pachunka is not prevented from performing the essential duties of Any Occupation due to a physical condition. However, the medical information in out file supports her Disability due to restrictions as a result of a Mental Illness as of 1/17/16. Therefore, Ms. Pachunka's claim is subject to the Mental Illness and Substance Abuse Benefits provision as of 1/17/16. As a result, no benefits will be payable beyond 1/16/18.

-10-

89.     In its February 18, 2016 letter, Harford provided appeal rights to Ms. Pachunka:

> If you do not agree with our denial, in whole or in part, and you which to appeal our decision, you or your authorized representative must write to us within one hundred eighty (180) days from the receipt of this letter. . . .Upon completion of that review, we will advise you of our further determination.

90.     Hartford could not know in February 2016, what Ms. Pachunka's conditions would be in January 2018.

91.     In its February 18, 2016 determination, Hartford failed to conduct a whole person analysis.

92.     Hartford's determination was inconsistent with its previous findings that Ms. Pachunka was Disabled from a physical standpoint.

93.     Hartford ignored its own medical file reviewer findings by Ms. Buckley in reaching its determination that Ms. Pachunka was Disabled based on a Mental Illness.

94.     Hartford ignored its LWOP file review conclusions in reaching its determination.

95.     Despite referencing the LWOP file and Ms. Pachunka's request for its disclosure, Hartford failed to produce this relevant documentation.

96.     In reaching its determination, Hartford disregarded Ms. Reynolds and Dr. Alfonzo's October 22, 2015 APS findings of a less than sedentary capacity.

97.     Hartford further disregarded Dr. Sabahi's assessment that, "in the absence of Ms. Pachunka's psychological symptoms, the [sic] physical/pain related complaints [are] enough to preclude occupational functioning."

98.     Hartford based its decision on cherry-picked information.

99.     Hartford selected information from a December 30, 2015 assessment form that only assessed Ms. Pachunka's ability to sit, reach above the shoulder, and finger/handle.

100.    The December 30, 2015 assessment form Hartford relied on did not assess Ms. Pachunka's ability to stand, walk, lift, etc.

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

101.   Ms. Pachunka's functional ability cannot be determined from the December 30, 2015 assessment form given its limited scope.

102.   The December 30, 2015 form only allows a treating provider to select a limit 4 or more hours of sitting. There was no option for a limit of 3 or less hours of sitting. The form is designed to deter an accurate assessment of lower levels of functionality.

103.   Hartford relied on a year-old Occupational Medicine Peer Review, which poorly documents a telephone call with Ms. Pachunka's treating provider, Dr. Sabahi.

104.   Hartford's internal notes about that Occupational Medicine Peer Review, state that, "it would be reasonable to re-evaluate these restrictions **within one year** from the date of this report." (emphasis added).

105.   In its December 29, 2015 letter to Ms. Reynolds, the Hartford misrepresented Dr. Sabahi's current occupation assessment of Ms. Pachunka, instead citing to the outdated Occupational Medicine Peer Review that was no longer valid.

106.   Dr. Sabahi assessed that, "[Ms. Pachunka] is preclude[d] [from] occupational functioning."

107.   Hartford fabricated treating provider opinions, which were unreflective of their true opinions.

108.   In its February 18, 2016 determination, Hartford piecemealed restrictions and limitations from two separate forms, the August 20, 2015 and December 30, 2015 assessment forms completed by Ms. Reynolds, using the standing and walking restrictions from the August 20, 2015 form and the sitting restrictions from the December 30, 2015 form.

109.   Neither the August 20, 2015 nor December 20, 2015 assessment forms by Ms. Reynolds were indicative of full-time work, sedentary or otherwise, by themselves.

110.   None of Ms. Pachunka's treating providers have ever assessed her as being able to work on a full time basis.

111.   In its February 18, 2016 determination, Hartford gave exorbitant and inordinate weight to its file reviewers.

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

-12-

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

112.    On January 10, 2016, Lisa Screen Housley, CRC, conducted an Employability Analysis ("EA") at the request of Hartford.

113.    Ms. Housley's EA was solely based on Hartford's cherry-picked collaboration of the two APS forms.

114.    On August 16, 2016, Ms. Pachunka timely appealed Hartford's February 18, 2016 determination that she was only Disabled from a mental health perspective. She argued and presented evidence that she is Disabled from Any Occupation as a result of *both* her physical and mental Disabilities – collectively and individually – and therefore should not be limited to a 24-month benefit limitation.

115.    Hartford's appeal process requires an appeal specialist to respond to all appeals within 90 days. The deadline to respond was November 14, 2016. As set forth below, Hartford did not meet it.

116.    Ms. Pachunka's mental Disability does not mean that she is not also Disabled from a physical standpoint. In the absence of her mental Disability, Ms. Pachunka would continue to meet the definition of Disability based on her physical medical conditions.

117.    As part of her appeal submission, Ms. Pachunka submitted updated medical evidence further supporting her Disability from a physical standpoint.

118.    Ms. Pachunka submitted August 16, 2016 assessment forms by Dr. Sabahi, which concluded that Ms. Pachunka could not work in Any Occupation.

119.    Ms. Pachunka's treating physicians have consistently assessed that she cannot work from a physical standpoint.

120.    Ms. Pachunka also underwent a vocational evaluation by Mark Kelman, CRC, who concluded in his July 28, 2016 report that Ms. Pachunka cannot work in Any Occupation.

121.    Mr. Kelman reviewed Ms. Housley's EA and concluded that, "the jobs identified and subsequent wages are not realistic, but are more computer generated." "[Ms. Pachunka] does not have the stamina to do these types of jobs, which is supported by the totality of [the] medical evidence; and even if she were able to do these jobs, the median

wage does not represent a realistic level of pay."

122.  On August 25, 2016, Hartford acknowledged receipt of Ms. Pachunka's August 16, 2016 appeal and August 22, 2016 supplemental information, and informed her that a determination would be forthcoming.

123.  Hartford agrees in the LTD Policy and represented to the Arizona Department of Administration ("ADOA") that it would render determination following receipt of a request for review of a disability claim no later than 90 days after receipt, regardless of whether it denied a claim in whole or in part.

124.  On August 29, 2016, Hartford notified Ms. Pachunka that it would **not** make a determination on her appeal, noting that, "[t]he additional proof of loss that you have provided negates the need for an appeal review at this time as the claim is still actively approved."

125.  On September 21, 2016, Ms. Pachunka responded to Hartford's failure to review her LTD appeal.

126.  Ms. Pachunka argued that because the determination denied her rights to LTD benefits beyond January 16, 2018, she had a right to appeal that determination, and Hartford had a duty to review the appeal.

127.  Hartford never responded to Ms. Pachunka's August 16, 2016 appeal.

128.  In denying Ms. Pachunka's right to review, Hartford has caused Ms. Pachunka irreparable financial harm and breached its contractual obligations to both Ms. Pachunka and the ADOA.

129.  In a letter dated November 29, 2016, Hartford asked for Ms. Pachunka to complete forms for its "claim records" and to ask about "other income benefits she received now or in the future." It continued to ignore her appeal and the evidence she presented along with it.

130.  On December 14, 2016, Hartford had again reviewed Ms. Pachunka's LWOP claim and was "pleased to inform" her of approved ongoing waivers of premium.

**OBER & PEKAS, PLLC**
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

131.    Ms. Pachunka is informed and believes that Hartford has approved her LWOP claim based on her Disability from a physical standpoint.

132.    In a letter dated January 9, 2017, Ms. Pachunka responded to Hartford's November 29, 2016 request for forms. She included Dr. Sabahi's August 16, 2016 assessment forms that addressed both her physical and mental health conditions, as well as updated medical records from Drs. Sabahi, Shaw, Evans and Smith; and explained that Dr. Shaw would not complete an assessment form, attaching proof of his refusal based on his office policy. She reiterated that she was disabled from a physical standpoint and directed Hartford to reference her August 16, 2016 appeal.

133.    In a letter dated January 17, 2017, Hartford responded to the January 9, 2017 letter and did not express any concern that Dr. Shaw would not complete the form. Instead, Hartford asked for assistance in obtaining medical records and specifically asked that Dr. Sabahi respond to its November 2, 2016 letter sent directly to Dr. Sabahi as to Ms. Pachunka's functionality.

134.    On January 30, 2017, Ms. Pachunka, through legal counsel, provided updated medical records and requested Hartford to send her its November 2, 2016 letter to Dr. Sabahi.

135.    Ms. Pachunka's counsel finally received Hartford's November 2, 2016 letter to Dr. Sabahi on January 31, 2017.

136.    On February 7, 2017, Ms. Pachunka's counsel responded to Hartford's November 2, 2016 letter to Dr. Sabahi via e-mail, explaining several issues: 1) Hartford sent the letter to Dr. Sabahi directly and did not notify Ms. Pachunka's legal counsel when doing so; 2) Hartford did not provide the 12/09/14 Occupational Medicine peer review conducted by Dr. Akshay Sood, which was purportedly attached to Hartford's letter for Dr. Sabahi but not included in the copy it sent to Ms. Pachunka's counsel; 3) Ms. Pachunka's counsel sought clarification on Hartford's confusing and misleading questions to Dr. Sabahi, which made no sense and which were drafted to support a termination of benefits if answered by Dr. Sabahi the way Hartford suggested; 4) a request as to whether Hartford

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

would pay for Dr. Sabahi's time in light of the information it was seeking from him; and 5) Hartford should copy Ms. Pachunka's legal counsel on all correspondence with Ms. Pachunka's treating providers to avoid situations such as this in the future.

137. On February 16, 2017, Ms. Pachunka's legal counsel faxed the February 7, 2017 email to ensure Hartford received it.

138. On February 17, 2017, Hartford sent a letter inquiring about the status of Ms. Pachunka's Social Security Disability Insurance ("SSDI") hearing, specifically whether it had been scheduled and, if so, when it was scheduled to take place. Hartford further demanded that all requested information be returned by March 10, 2017 in order to avoid a delay in processing the claim.

139. On February 28, 2017, Ms. Pachunka's counsel informed Hartford by letter that her SSDI hearing had taken place on January 6, 2017, and that a decision had not yet been reached.

140. On March 10, 2017, Hartford renewed its January 17, 2017 request for updated medical information, specifically regarding Ms. Pachunka's restrictions and limitations, even though this information was provided with Ms. Pachunka's January 9, 2017 letter. Hartford ignored Ms. Pachunka's previous request for clarification on the issues surrounding Hartford's November 2, 2016 letter to Dr. Sabahi.

141. On March 17, 2017, Ms. Pachunka responded to Hartford's March 10, 2017 letter referring Hartford back to her previous correspondence containing the requested medical information, renewing her request for clarification on Hartford's November 2, 2016 letter to Dr. Sabahi, and informing Hartford of Ms. Pachunka's recent award of SSDI benefits (discussed *infra*), which further proved Ms. Pachunka's physical disabilities.

142. On May 1, 2017, Ms. Pachunka sent a letter as a follow-up to her March 17, 2017 letter, to which Hartford had failed to respond.

143. On May 4, 2017, Hartford again demanded updated medical information and ignored the information previously supplied by Ms. Pachunka in her August 16, 2016 appeal, as well as in her January 9, January 30, and March 10, 2017 letters.

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

144. Hartford advised Ms. Pachunka that no benefits would be issued beyond May 31, 2017 until Hartford received the requested information.

145. Hartford told Ms. Pachunka that if the requested information were not received by May 31, 2017 it would assume she did not wish to pursue additional benefits and would close her claim.

146. Despite having already supplied the requested medical information, Ms. Pachunka complied with Hartford's repeated request for an updated assessment form and on June 9, 2017, provided Hartford with a supporting statement from Dr. Sabahi, which addressed her restrictions and limitations from a physical standpoint only.

147. On May 31, 2017, Ms. Pachunka provided Hartford with a list of treating providers so that it may obtain her updated medical records. Hartford was already in possession of Ms. Pachunka's treating provider information, as well as an authorization to obtain this information. Yet, it had failed to do so.

148. On May 31, 2017, Ms. Pachunka reiterated that her treating mental health provider, Dr. Shaw, would not complete assessment forms as a matter of office policy; therefore, she would not be able to facilitate this request.

149. Hartford had been informed and provided proof that Dr. Shaw does not complete assessment forms on at least two prior occasions.

150. Hartford's threat to close Ms. Pachunka's claim if she did not provide the mental APS form, or any APS form for that matter, was unreasonable, as the APS forms are not a requirement for Proof of Loss under the Plan.

151. In lieu of an APS form, which was an option provided by Hartford, Ms. Pachunka provided Hartford with a June 8, 2017 letter from Dr. Sabahi as follows,

> Based on my medical opinion and longstanding treatment of Lynn, she is unable to work at this time. She cannot sit comfortably for more than 45 minutes at a time for a total of 4 hours in an 8-hour day. She cannot stand or walk more than 20 minutes at a time for a total of 2 hours in an 8-hour day. She would not be able to complete a 40-hour workweek. She cannot bend at the waist, kneel, crouch, climb, or balance. She should not lift more than 10 pounds occasionally. Due to the severity of her pain, Lynn would likely be an unreliable employee with excessive absenteeism. She is also limited by fatigue and difficulty concentrating, which is intensified by her medications. Without medications,

Lynn's pain is intolerable and severely affects her ability to function. Lynn also suffers from secondary depression, for which I do not treat her. The above referenced limitations are based on her physical conditions only.

152.     In its June 21, 2017 letter, Hartford confirmed receipt of Dr. Sabahi's letter, informed it was continuing its year-long review of Ms. Pachunka's eligibility from a physical standpoint and, in the meantime, suspended benefits beyond May 31, 2017, because it did not receive an updated mental APS form.

153.     Under the LTD Plan, Hartford had no basis to suspend Ms. Pachunka's LTD benefits.

154.     Hartford's suspension of Ms. Pachunka's benefits for a form that it knew she could not obtain and was not a requirement for Proof of Loss, was done in bad faith.

155.     Hartford's suspension of Ms. Pachunka's benefits has caused her financial harm.

156.     Had Hartford made a timely determination on Ms. Pachunka's August 16, 2016 LTD appeal, Ms. Pachunka would not be in this position.

157.     On July 10, 2017, Hartford informed Ms. Pachunka that an Independent Medical Examination ("IME") was needed to determine if Ms. Pachunka meets the provisions of the policy from a physical perspective.

158.     On July 11, 2017, Ms. Pachunka was provided an Authorization to complete and return. She was advised that if she did not provide the signed Authorization by August 8, 2017, Hartford would consider it to be a refusal to provide Additional Proof of Loss and will proceed with a decision based on the information in the file, which "may result in a termination of Ms. Pachunka's benefits."

159.     During this time, Hartford continued to aggressively pursue an overpayment from Ms. Pachunka as a result of the SSDI award.

160.     Despite having the ability to do so, Hartford would not allow Ms. Pachunka to apply her monthly LTD benefits to the total SSDI overpayment; seemingly, because the Hartford planned on terminating her LTD benefits and wanted the overpayment in full before initiating its plan.

-18-

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

**OBER & PEKAS, PLLC**
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

161. Hartford failed to negotiate the overpayment in good faith and instead tried to use the negotiation process to gain a strategic advantage over Ms. Pachunka.

162. On July 19, 2017, Hartford confirmed in writing that if Ms. Pachunka remits $17,955.00 it would continue to withhold her monthly benefit to be applied to the overpayment balance. However, Hartford further added that, "if Ms. Pachunka's future benefits should cease, we would welcome a new discussion to facilitate a reimbursement plan revision prior to pursuing other remedies."

163. On July 26, 2017, Ms. Pachunka requested clarification as to the reimbursement plan, as her benefits were "suspended" at this time.

164. Ms. Pachunka was not provided clarification on the reimbursement plan, but was informed that Hartford was waiting on an Authorization to proceed with the long-past due determination of her physical Disability.

165. On July 27, 2017, Hartford was informed that it possessed a December 20, 2016 Authorization that was valid for two years. Ms. Pachunka inquired as to why this Authorization could not be used.

166. Hartford purported that the partial revocation on the December 20, 2016 Authorization prohibited a third party examiner to evaluate Ms. Pachunka; and therefore, would need a new Authorization.

167. On information and belief, the new Authorization provided to Ms. Pachunka was improper and not intended for Hartford's purported need.

168. When compared to the December 20, 2016 Authorization, the new Authorization included additional information that it may be used for SSDI, or subrogation or reimbursement purposes.

169. This additional language inputted into the Authorization serves no purpose in Hartford's purported need to schedule an IME or in furthering its review of Ms. Pachunka's eligibility for benefits under the LTD Policy.

170. The December 20, 2016 Authorization did not preclude Hartford from scheduling an IME.

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

171.    Notwithstanding her reservations, Ms. Pachunka provided Hartford with a new Authorization on August 8, 2017.

172.    Because Ms. Pachunka's LTD benefits continue to be suspended since May 31, 2017, she has not received LTD payments since that time, despite the overpayment being satisfied.

173.    On October 10, 2017, Hartford's claim examiner, Karen Washington, contacted Ms. Pachunka's counsel via telephone and informed Ms. Pachunka that Hartford had "been scheduling an IME" and sent a letter that same day advising of the IME date and time.

174.    Hartford uses IMEs when: 1) the medical evidence is conflicting; 2) it needs to determine SSDI eligibility; or 3) when the definition of disability changes from Own Occupation to Any Occupation. Despite none of these circumstances existing, on October 10, 2017, Ms. Pachunka received a notice of IME scheduled with Brian McCrary, MD.

175.    On information and belief, Hartford elected to employ Dr. McCrary for his propensity to write reviews supportive of a termination of benefits.

176.    Under the LTD Policy, Ms. Pachunka has a "valid reason for refusal" for not providing additional Proof of Loss by participating in the IME.

177.    Ms. Pachunka does not have an obligation to exhaust administrative remedies under the LTD Policy and applicable law.

178.    On October 20, 2017, Ms. Pachunka's counsel informed Ms. Washington via e-mail that Ms. Pachunka would not be attending the IME and, instead, would be filing a lawsuit against Hartford for its breach of contract and insurance bad faith.

179.    The collective evidence supports Ms. Pachunka's claim for benefits.

*Ms. Pachunka's SSDI Benefits*

180.    When Hartford expects a claimant will exceed the SSDI elimination period and appears to meet the SSA's Definition of disability, Hartford requires the claimant to apply for SSDI benefits.

181.    At Hartford's insistence, Ms. Pachunka applied for SSDI benefits.

182.    On March 8, 2017, the SSA issued a Fully Favorable Decision awarding Ms. Pachunka SSDI benefits.

183.    The SSA found that Ms. Pachunka's physical medical conditions limited her to a less than sedentary work capacity.

184.    On May 1, 2017, Ms. Pachunka notified Hartford of the SSA's Fully Favorable Decision and provided a copy of the Notice of Award to Harford to support her August 16, 2016 LTD Appeal.

185.    The SSA award of SSDI benefits resulted in an overpayment of benefits to Ms. Pachunka.

186.    The LTD Policy allows Hartford to collect overpayments at its discretion, which includes applying monthly benefits to an overpayment.

187.    Because her future benefits are in excess of the overpayment, Ms. Pachunka requested that Hartford recoup the overpayment by offsetting future benefits.

188.    In her May 1, 2017 letter, Ms. Pachunka requested that Hartford apply her monthly LTD benefit to the SSDI overpayment until it is satisfied.

189.    Hartford refused that request.

190.    Hartford provided its calculations for the SSDI overpayment, concluding that the LTD claim was overpaid in the amount of $31,789.40.

191.    On May 4, 2017, Hartford informed Ms. Pachunka that it was immediately stopping LTD benefits until the overpayment was reimbursed.

192.    Attached to the May 4, 2017 letter was a Repayment Agreement for Ms. Pachunka to elect her method of repayment.

193.    On May 4, 2017, consistent with the Repayment Agreement options, Ms. Pachunka elected for Hartford to apply her future monthly LTD benefit to the SSDI overpayment.

194.    Despite the SSA determination, in a separate letter that same day, Hartford told Ms. Pachunka it needed an APS from her mental health provider and a Behavioral Functional Abilities Form filled out.

-21-

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

195.   Hartford's demand for immediate repayment of the overpayment on Ms. Pachunka's STD and LTD claims as a result of the SSDI award reveals that Hartford put its financial interests ahead of Ms. Pachunka's interests.

196.   In a May 12, 2017 telephone call, Hartford informed Ms. Pachunka that it would not allow her to apply her future monthly LTD benefits to the SSDI overpayment.

197.   In a May 24, 2017 telephone call, Ms. Pachunka was informed that in lieu of one full lump sum payment, Ms. Pachunka may pay $17,955.21 in a lump sum and the rest of the overpayment may come from her future LTD benefits.

198.   On information and belief, Ms. Pachunka was offered this alternative payment resolution because it would result in a full reimbursement of the overpayment as of the date her LTD benefits would be terminated under maximum benefit allowed under the Mental Illness limitation.

199.   On or around May 25, 2017, Hartford applied Ms. Pachunka's May 2017 LTD benefit as reimbursement to the SSDI overpayment.

200.   On information and belief, Hartford has not considered Ms. Pachunka's SSDI award as it relates to her physical disability.

201.   On information and belief, Hartford's only interest in the SSDI award is the financial benefit to Hartford.

202.   On August 30, 2017, Hartford acknowledged receipt of Ms. Pachunka's payment toward her SSDI overpayment, but purported that she owed additional funds.

203.   Hartford had failed to credit the attorneys' fees Ms. Pachunka paid.

204.   On September 25, 2017, Ms. Pachunka provided proof that the SSDI overpayment was paid in full and requested confirmation from Hartford that it agreed.

205.   Hartford confirmed that Ms. Pachunka was not required to repay the $6,000 SSDI benefits withheld by the SSA and paid to her representative pursuant to an approved fee agreement.

206.   In a letter dated October 10, 2017, Hartford confirmed that the overpayment was paid in full.

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

207.    To her financial detriment and without the promise of future LTD benefits, on August 22, 2017, Ms. Pachunka was forced to reimburse Hartford the full amount of the overpayment due to the stress and uncertainty of the process, as well as the imminent threat of further collection efforts from Hartford.

208.    Ms. Pachunka paid over $30,000 to Hartford to reimburse it for the overpayment.

209.    Despite previous discussions regarding itemization of the overpayment amount, Hartford later miscalculated the overpayment amount and attempted to collect more money from Ms. Pachunka.

210.    Despite accepting the benefit of the SSA determination that Ms. Pachunka has less than sedentary work capacity due to her physical disabilities, Hartford suspended LTD payments to Ms. Pachunka and immediately began looking for ways to terminate her LTD benefits.

*Hartford's Relationship With The State of Arizona*

211.    Hartford provides Life, STD, LTD and AD&D insurance to some employees of the State of Arizona through the ADOA.

212.    Hartford considers the ADOA to be a prestigious client.

213.    As set forth in extensive documentation on the State of Arizona procurement website, Hartford handles thousands of lives for the ADOA, even having an entire team in Sacramento and beyond dedicated to the ADOA.

214.    Hartford has a full-time onsite representative at the ADOA, Ms. Patricia Cisneros, and a National Account Manager, Courtney Capek, located in Phoenix, AZ.

215.    As of 2014, Ms. Capek was responsible for four Hartford clients, including the ADOA.  Covered lives in her care ranged from 7,000 to 65,000.

216.    Ms. Capek holds Hartford's Group Benefits Disability Specialist Certification and is adept at solving account and claims issues for Hartford.

217.    Among its many responsibilities, Hartford must meet or exceed Performance Guarantees to the ADOA or else face financial penalties if not met.

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

218.     The Performance Guarantees were precipitated by the ADOA's dissatisfaction with Hartford's claim handling.

219.     In November 2014, the ADOA questioned why it does not offer settlement on the State of Arizona LTD Policy, noting that Hartford was requesting permission to allow it.

220.     The proposed parameters for settlement were:

The claimant's medical condition reached maximum medical improvement
The disorder should not be terminal or immediately life threatening
All offset issues should be resolved
SSDI should be resolved.

221.     Ms. Pachunka is informed and believes that settlement of LTD claims is a financial benefit to Hartford because it pays claimants less than to which the claimant would otherwise be entitled.

222.     In June 2015, at the time Hartford was demanding that Ms. Pachunka apply for SSDI benefits, which would result in an overpayment of STD benefits, ADOA called to Hartford's attention that its Benefit Highlight Sheet does not include a comment about overpayment recovery.

223.     In May 2016, Hartford attributed the dissatisfaction with its claims handling on changes to the plan design, rather than Hartford's performance and did not want to be penalized financially for the members' bad experiences.

**COUNT I**
**(Breach of Contract)**

224.     All other paragraphs are incorporated by reference.

225.     Hartford entered into a valid and binding contract with the State of Arizona to provide LTD benefits to Ms. Pachunka until she was no longer disabled or until his maximum benefit period under the terms of the Policy.

226.     Ms. Pachunka was an insured participant under the Policy.

227.     Ms. Pachunka reasonably expected that she met the requirements of Disability as defined by the LTD Policy, and that she would receive benefits under the LTD Policy until she was no longer disabled or until his maximum benefit period.

**OBER & PEKAS, PLLC**
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

228. Despite Ms. Pachunka's disability coverage, Hartford improperly terminated her LTD benefits in breach of the Policy.

229. Hartford breached the contract by failing to furnish Ms. Pachunka with adequate written notification of its claims decisions as required by the LTD Policy. This includes but is not limited to its repeated failure to "give the specific reason(s) for the denial [in whole or in part]; . . . provide a description of any additional information necessary to perfect and an explanation of why it is necessary; and provide an explanation of the review procedure."

230. Hartford breached the contact by depriving Ms. Pachunka of a "full and fair review" of her various appeals, particularly with respect to her August 2016 appeal, which Hartford ignored entirely. In further breach of the contract, Hartford never responded in writing with its final decision on the claim following the 2016 appeal.

231. Hartford breached the contract by communicating directly with treating providers outside of Ms. Pachunka's legal counsel's knowledge when the LTD Policy explicitly permits for Ms. Pachunka to have legal representation on appeal.

232. Hartford breached the contract by failing to produce relevant documents for Ms. Pachunka's review as required by the LTD Policy. Hartford expressly withheld relevant documents without reasonable explanation as to what relevant documents were being withheld and how the LTD Policy allowed for the partial disclosures.

233. Hartford breached the contract by requiring Ms. Pachunka to apply for SSDI benefits but then ignoring the SSA's findings.

234. Hartford breached the contract by reneging on the reimbursement agreement it provided to Ms. Pachunka.

235. Hartford's claim handling and decision to terminate benefits was designed to benefit Hartford financially to Ms. Pachunka's detriment.

236. Hartford's decision to terminate benefits was not supported by substantial evidence.

237.    Hartford terminated Ms. Pachunka's LTD benefits with the knowledge that it had no reasonable basis for doing so.

238.    Ms. Pachunka meets Hartford's "Any Occupation" definition of disability. Hartford breached the contract by failing to consider Ms. Pachunka's education, training, experience, and earnings potential in conducting its "Any Occupation" review.

239.    Hartford improperly terminated Ms. Pachunka's LTD benefits in breach of the Policy.

240.    The evidence supported Ms. Pachunka's continuing eligibility.

241.    Despite its obligation under the Policy, Hartford failed to consider all of the evidence in support of Ms. Pachunka's inability to work in Any Occupation, which constitutes a breach of contract.

242.    Hartford ignored the opinions of Ms. Pachunka's treating providers and relied on manipulated vocational parameters and restrictions to terminate benefits.

243.    Hartford ignored the SSA's determination that Ms. Pachunka is disabled from any gainful employment because of her physical disabilities.

244.    Hartford breached the contract by finding Ms. Pachunka was Disabled solely from Mental Illness.

245.    Hartford failed to pay Ms. Pachunka her LTD benefits despite being obligated to do so under the Policy.

246.    Hartford demanded objective medical evidence and testing to prove subjective complaints, which does not exist and which is not required by the LTD Policy.

247.    Hartford failed to apply the LTD Policy's definition of "treatment," thereby breaching the contract. It unjustifiably failed to credit Ms. Pachunka's subjective complaints, including her complaints of pain, fatigue, and medication side effects. It did not consider Ms. Pachunka's attendance for medical visits or Ms. Pachunka's providers' observations in finding appropriate treatment. It also did not consider her use of medications as treatment.

248.    In violation of the LTD Policy, Hartford failed to send Ms. Pachunka to an IME prior to making determinations that impacted coverage. Its effort to send her to an

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

IME after suspending benefits breached the contract.

249.   Hartford refused to consider Ms. Pachunka's 2016 appeal in violation of the LTD Policy, causing her irreparable harm.

250.   Hartford breached the contract by violating the LTD Policy's Overpayment Recovery provision. Hartford sought overpayment in a manner that served its best financial interests and not those of Ms. Pachunka, which breached the contract and constituted bad faith. It abandoned the LTD Policy to explore manipulative ways for collecting overpayment from Ms. Pachunka and minimizing its financial liability. For instance, despite Hartford's ability to recover its overpayment from future benefits under the LTD Policy, Hartford unreasonably refused to do so, because it did not plan on paying future benefits. It tried to negotiate partial payments with Ms. Pachunka instead, and Ms. Pachunka is informed and believes it did this because it did not intend to approve her claim.

251.   Ms. Pachunka remains Disabled under the Policy and is entitled to LTD benefits.

252.   Ms. Pachunka has been damaged as a direct result of Hartford's failure to pay LTD benefits under the Policy. She has suffered financially and has been seriously compromised in her ability to provide for herself.

253.   Hartford's failure to pay benefits was not based on the existence of a genuine dispute, is not fairly debatable, and its claims decision lacked a reasonable basis.

254.   Hartford's denial constitutes anticipatory repudiation of the contract and, therefore, Ms. Pachunka is entitled to current receipt of all of her LTD benefits.

**COUNT II**
**(Insurance Bad Faith)**

255.   All previous paragraphs and headings are incorporated by reference.

256.   Hartford breached the duty of good faith and fair dealing by unreasonably terminating Ms. Pachunka's LTD benefits in direct contradiction of the medical evidence.

257.   Hartford acted unreasonably in evaluating Ms. Pachunka's claim, and it intentionally terminated her benefits without a reasonable basis.

**OBER & PEKAS, PLLC**
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

258.    Hartford's claim handling was designed and implemented to find ways to reduce or avoid its liability.

259.    Hartford contacted treating physicians without releases or authorization from Ms. Pachunka. In some cases, it presented fraudulent authorization forms.

260.    In administering claims, Hartford misrepresents treating provider opinions and intentionally uses outdated information in an effort to limit its liability.

261.    Even after Ms. Pachunka notified Hartford multiple times of her objection to the unauthorized contacts with her treating physicians, Hartford continued to contact them.

262.    Hartford administered Ms. Pachunka's claim with the intent to terminate benefits.

263.    Hartford completed EAs in Ms. Pachunka's claim in bad faith.

264.    As an institution, Ms. Pachunka is informed and believes Hartford routinely secures EAs based on biased information in violation of the Code of Professional Ethics for Rehabilitation Counselors and in violation of its duty of good faith and fair dealing. In the EA referral process, Hartford fails to provide all relevant evidence and requests analyses based solely on biased, inaccurate limitations. Hartford uses these EAs as a basis for terminating claims, including but not limited to Ms. Pachunka's claim.

265.    As an institution, Ms. Pachunka is informed and believes that Hartford uses misleading forms in communicating with claimants' treating providers, and that these forms are designed to discourage treating providers from accurately assessing and reporting functionality. This practice causes widespread harm to claimants. The forms do not solicit adequate information for even determining functionality; for instance, it does not address a claimant's ability to stand, walk, lift, etc. This practice constitutes bad faith.

266.    As an institution, Hartford unreasonably demands proof of loss that it knows is untenable for claimants to provide and that is not a requirement of the LTD Policy. In doing so, it shifts an impossible burden to claimants, despite the LTD Policy clearly allowing Hartford to collect proof of loss by requiring in-person interviews, evaluations, etc. But when claimants cannot provide the demanded proof of loss, Hartford improperly

**OBER & PEKAS, PLLC**
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

1  terminates their claims. In Ms. Pachunka's claim, for example, Dr. Shaw would not

2  complete a requested form for Hartford; this is because he does not complete forms for any

3  of his patients. Despite Ms. Pachunka explaining this fact to Hartford and providing proof

4  of Dr. Shaw's blanketed refusal as part of his practice, Hartford terminated Ms. Pachunka's

5  claim prematurely because she could not force Dr. Shaw to complete the form. However,

6  nothing in the LTD Policy requires Proof of Loss in the form of statements from

7  physicians. Hartford's practice to demand Proof of Loss this way is bad faith on an

8  institutional level.

9      267.    Ms. Pachunka is informed and believes that, when claimants fail to furnish

10  "proof of loss," Hartford reports the claim to the State of Arizona differently than if

11  Hartford simply had denied the claim on the merits. This difference in reporting allows

12  Hartford to continue its contractual relationship with the State of Arizona, avoid penalties,

13  and appear to be more fair in claims handling than it is really being.

14      268.    Hartford's insistence that an IME was necessary to assess Ms. Pachunka's

15  claim is an admission that its decision to suspend benefits was not fairly investigated. This

16  conduct constitutes breach of contract, as well as bad faith. *See Cherry v. Dig. Equip. Corp.*

17  *Long-Term Disability Plan*, 2006 U.S. Dist. LEXIS 68099, at *21-22 (E.D. Cal. Aug. 10, 2006)

18  ("defendants had already denied plaintiff's benefits before deciding there was a need for an

19  IME. Thus, if an IME was genuinely necessary, this calls into question whether there was

20  sufficient support for Prudential's initial decision to deny benefits.") If an IME was

21  necessary for Hartford to make a decision as to whether Ms. Pachunka was disabled from a

22  physical perspective, then suspending benefits without an IME is an act of bad faith.

23      269.    Choosing Dr. Brian McCrary and waiting to collect the overpayment before

24  continuing to investigate the claim are also acts of bad faith.

25      270.    Hartford treats being on claim as an adversarial process, failing to treat its

26  insureds' interests with equal regard as it does its own interests.

27      271.    Hartford single-mindedly pursued offsets, taking an offset for an SSDI

28  decision it willfully and unjustifiably abandoned.

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

-29-

272.   Hartford failed to conduct a "whole person" analysis in an effort to place its financial interests ahead of Ms. Pachunka's. It parsed out Ms. Pachunka's mental and physical disabilities to find she was disabled from solely a mental health perspective. It did this against the weight of the evidence and to avoid liability under the LTD Policy, because the LTD Policy limits benefits to 24 months for disabilities due to mental health issues.

273.   Hartford has a duty to conduct a fair, thorough, and objective review. Instead, it conquered and divided Ms. Pachunka's diagnoses in an effort to eliminate them one by one. Hartford cannot select parts from various treating provider forms to create self-serving, makeshift restrictions and limitations. This is the very definition of "cherry-picking" and bad faith.

274.   On information and belief, as an institution, Hartford uses "segments" to set claims on paths which include predetermined processes to achieve certain outcomes.

275.   On information and belief, Hartford assigns claims to "segments" based on what Hartford prospectively determines should be the resolution of the claimant's disability before obtaining all of the medical evidence.

276.   On information and belief, Hartford's "segments" are internal claims guidelines used by Hartford to manage claims based on Hartford's anticipated financial liability.

277.   On information and belief, Hartford assigns a claim to "segment 1" if it deems the claim has low medical or occupational complexity or anticipated the claimant will return to work.

278.   On information and belief, Hartford assigns a claim to "segment 2" if it deems the claimant will return to their own or an alternate occupation.

279.   On information and belief, Hartford assigns a claim to "segment 3" if it deems the claims has occupational or financial complexities and the outcome is uncertain.

280.   On information and belief, the peer reviewers, internal medical reviewers, and vocational examiners were financially incentivized to deny Ms. Pachunka's claim.

281.   Hartford's conduct was motivated by financial considerations, caused by its

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

structural conflict of interest as both decision maker and payer of Ms. Pachunka's LTD benefits. Hartford has failed to produce any evidence that it protected Ms. Pachunka from its conflict and instead intentionally withheld information that would have otherwise revealed the depth of its self-interested conduct. This is also bad faith.

282.    As an institution, Hartford uses claim payment reduction goals and cost containment measures as a method of profit-making for the company. In so doing, Hartford unfairly and arbitrarily reduces or denies payments on legitimate claims in an across-the-board fashion to attain its numerical reduction goals. Hartford's cost containment measures are consistent with and a part of a corporate-wide plan and scheme.

283.    On information and belief, Hartford ties employee compensation either directly or indirectly to Hartford's profits.

284.    On information and belief, claim liability is a consideration during employee evaluations.

285.    On information and belief, Hartford advertises the "cost savings" it provides in claim handling.

286.    On information and belief, emails are sent to claims department employees at Hartford setting forth the profitability of Hartford as a whole and separately for the benefit departments for the preceding quarter. This email would be followed by another email explaining whether the employee would be getting a bonus.

287.    On information and belief, the employees understood that their bonuses were based on how profitable Hartford was.

288.    On information and belief, all employees have access to benefit amounts and computations.

289.    On information and belief, claim decisions are made by employees with no medical training and who, therefore, have no basis on which to make medical judgments or choose between competing medical opinions.

290.    Throughout the claim, Hartford's actions demonstrated its efforts to limit liability on Ms. Pachunka's claim, even before it had the medical evidence necessary for a

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

review. For example, it demanded Ms. Pachunka to pursue other income benefits based on her disability while trying to find ways to claim her physical condition was not disabling, and trying to cast her disability as mental to limit its liability.

291.    Ms. Pachunka is informed and believes that Hartford did not set aside adequate reserves to pay her claim, specifically with respect to Disabled Life Reserves ("DLR").

292.    Ms. Pachunka is informed and believes that Hartford did not intend to pay her claim beyond a certain date, which is reflected in its reserves calculation.

293.    Hartford placed its financial interests ahead of Ms. Pachunka's interests, failing to act with the decency and humanity required by the duty of good faith and fair dealing.

294.    On information and belief, Hartford companywide employs IME doctors, consultants, and peer reviewers who the Hartford knows will provide biased reports in favor of benefit terminations.

295.    Hartford either intended to injure Ms. Pachunka or acted to serve its own interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure Ms. Pachunka.

296.    Clear and convincing evidence exists that Hartford acted with an evil mind when engaging in aggravated and outrageous conduct.

297.    Hartford willfully decided to act against Ms. Pachunka by terminating her LTD benefits. The evidence demonstrates that Hartford placed its financial interests ahead of Ms. Pachunka's interests, failing to act with the decency and humanity required of it as an insurer. Hartford's conduct towards Ms. Pachunka was willful, oppressive, malicious, deceptive, and was in conscious disregard of Ms. Pachunka's rights, with the intent to harm or injure Ms. Pachunka, such that there should be an assessment of punitive damages against Hartford in an amount appropriate to punish and deter it.

298.    Hartford's handling of Ms. Pachunka's claim was inconsiderate, rude, oppressive, outrageous, and in total disregard for her safety, welfare, and well-being.

OBER & PEKAS, PLLC
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

299. As a result of Hartford's wrongful conduct, Ms. Pachunka has suffered pecuniary damages under the LTD Policy, including but not limited to past-due and future LTD benefits, other damages to be shown at trial, and attorneys' fees and costs.

300. As a proximate result of Hartford's conduct, Ms. Pachunka has also suffered and will continue to suffer pain, anxiety, worry, humiliation, and physical and emotional distress, all to her general damage in an amount to be shown at trial.

301. Ms. Pachunka relied on Hartford's promise of coverage to her extreme detriment.

302. Ms. Pachunka subscribed to coverage under the LTD Policy, believing the promises Hartford made as to the security such coverage would afford her. She purchased coverage years prior to becoming disabled, never thinking she would need the coverage but feeling more secure with the knowledge it was there. Indeed, she paid for and was entitled to participation in the LTD Policy.

303. Hartford's conduct has denied Ms. Pachunka the security and peace of mind she thought she possessed as a result of being insured.

304. Through outrageous conduct motivated by its improper financial interests, Hartford abandoned the clear terms of the LTD Policy to find Ms. Pachunka no longer disabled.

305. For Hartford's breach of its duty of good faith and fair dealing, Ms. Pachunka is entitled to future benefits under the LTD Policy.

306. Ms. Pachunka is entitled to recover attorneys' fees pursuant to A.R.S. § 12-341.01.

WHEREFORE, Ms. Pachunka respectfully requests that the Court award:

A.  All past and future benefits due under the terms of the LTD Policy, including immediate receipt of future benefits as a result of Hartford's anticipatory breach;

B.  Securement of the Life Policy and the premium waiver under the Life Policy;

**OBER & PEKAS, PLLC**
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

-33-

C.     Compensatory damages for mental, emotional, and physical distress and other incidental damages in an amount to be determined at jury trial;

D.     Costs of suit incurred by Ms. Pachunka;

E.     Attorneys' fees and costs pursuant to A.R.S. § 12-341.01;

F.     Prejudgment interest on benefits and damages at the highest legal rate until paid;

G.     An assessment of punitive or exemplary damages in an amount to be determined at jury trial and sufficient to punish Defendants and deter future wrongful conduct; and

H.     Such further relief as the Court deems just and proper.

Dated this 27th day of October, 2017,

OBER & PEKAS, PLLC

By: _s/ Erin Rose Ronstadt_____
       Erin Rose Ronstadt
       Kevin Koelbel
       *Attorneys for Plaintiff*

**OBER & PEKAS, PLLC**
3030 North 3rd Street
Phoenix, AZ 85012
(602) 277-1745

-34-